

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | INDICTMENT 5:15 CR 194 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. _____ |
| | ) | 21 U.S.C. § 841(a)(1) |
| GREGORY INGRAM, | ) | 21 U.S.C. § 841(b)(1)(C) |
| | ) | |
| Defendant. | ) | JUDGE GAUGHAN |

The Grand Jury charges:

At all times material and relevant to this indictment and with respect to each Count contained herein:

### INTRODUCTION

1. At various times from at least as early as September 2013 to on or about October 2014, GREGORY INGRAM ("INGRAM"), purported to practice medicine as an emergency room physician at Akron General Medical Center Emergency Department, at several locations in the Northern District of Ohio. INGRAM knowingly and intentionally issued numerous prescriptions for controlled substances outside the usual course of professional medical practice

and not for a legitimate medical purpose. INGRAM issued such prescriptions despite having actual knowledge or willfully remaining blind to the fact that his "patients" were abusing, misusing, and/or redistributing the drugs he prescribed.

### GENERAL ALLEGATIONS AND TERMINOLOGY

2.  The Controlled Substances Act ("CSA") governed the manufacture, distribution, and dispensing of controlled substances in the United States. With limited exceptions, the CSA made it "unlawful for any person knowingly or intentionally" to "distribute or dispense . . . a controlled substance."

3.  The term "controlled substance" meant a drug or other substance included in the Schedules I, II, III, IV and V of the CSA.

4.  The term "dispense" meant to deliver a controlled substance to an ultimate user or research subject by, or pursuant to the lawful order of, a practitioner; it included the prescribing and administering of a controlled substance.

5.  The term "distribute" meant to deliver (other than by administering or dispensing) a controlled substance.

6.  The term "practitioner" meant a physician, medical doctor, or other person licensed, registered, or otherwise permitted, by the United States or the jurisdiction in which he or she practiced, to distribute or dispense a controlled substance in the course of professional practice.

7.  Defendant GREGORY INGRAM was a medical doctor licensed by the State of Ohio Medical Board and considered a "practitioner."

8. Individual practitioners who wanted to distribute or dispense controlled substances in the course of professional practice were required to register with the Attorney General before they were legally authorized to do so. Such individual practitioners would be assigned a registration number by the Drug Enforcement Administration ("DEA").

9. INGRAM was registered with the Attorney General and DEA under registration number FI3026867 at an address in Ravenna, Ohio.

10. Practitioners registered with the Attorney General were authorized under the CSA to write prescriptions for or to otherwise dispense Schedules II, III, IV and V controlled substances, as long as they complied with the requirements of their registration. 21 U.S.C. § 822(b).

11. For medical doctors, compliance with the terms of their registration meant that they could only issue a prescription to a patient if the prescription was "issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice." 21 C.F.R. § 1306.04(a). A doctor violated the CSA and Code of Federal Regulations if he or she issued a prescription for a controlled substance outside the usual course of professional medical practice and not for a legitimate medical purpose. Such knowing and intentional violations subjected the doctor to criminal liability under Section 841(a) of Title 21, United States Code. 21 C.F.R. § 1306.04(a).

12. This regulatory framework placed a similar burden on pharmacists. While the responsibility for the proper prescribing and dispensing of controlled substances rested initially with the physician, the regulation imposed a "corresponding responsibility" upon the pharmacist who filled the prescription. 21 C.F.R. § 1306.04(a). This regulation did not impose on the pharmacist a corresponding responsibility to practice medicine. It did, however, impose on the

pharmacist the responsibility not to fill an order that purported to be a prescription but was not a "prescription" within the meaning of the statute if the pharmacist knew that the issuing practitioner issued the "purported prescription" outside the usual course of professional medical practice and not for a legitimate medical purpose.

## CHARGED CONTROLLED SUBSTANCES

13. The CSA's "scheduling" of controlled substances was based on their potential for abuse, among other considerations. There are five schedules of controlled substances: Schedules I, II, III, IV and V. Drugs that had a high potential for abuse and could lead to severe psychological or physical dependence were classified as Schedule II controlled substances. Drugs that had a potential for abuse and could lead to moderate or low physical dependence or high psychological dependence were classified as Schedule III controlled substances. Drugs that could lead to more limited physical or psychological dependence relative to the controlled substances in Schedule III were classified as Schedule IV controlled substances. 21 U.S.C. Section 812.

14. Pursuant to the CSA and its implementing regulations, oxycodone was classified as a Schedule II narcotic controlled substance based on its high potential for abuse and potential for severe psychological and physical dependence. Oxycodone was sold under a variety of brand names, including Oxycontin and Percocet, as well as generic forms. Roxicet contains both oxycodone and acetaminophen. Oxycodone was one of the strongest prescription painkilling substances approved for use in the United States, and it was very addictive. When abused, oxycodone could be taken orally (in pill form), chewed, or crushed and snorted. Oxycodone

caused euphoria and a high that persons with a dependency and no actual medical necessity would seek.

15. Pursuant to the CSA and its implementing regulations, hydrocodone was classified as a Schedule III narcotic controlled substance based on its potential for abuse and physical and psychological dependence. Hydrocodone was sold generically or under a variety of brand names, including Vicodin (also known as "Vike"), Lortab (also known as "Tab"), and Loricet, and it came in a variety of strengths. When hydrocodone was legally prescribed for a legitimate medical purpose, it was typically used to combat acute, moderate to severe pain under the careful supervision of a treating physician. Hydrocodone was a derivative of opium, which was also used to manufacture heroin. Hydrocodone successfully diminished pain, but it was addictive and the withdrawal symptoms of hydrocodone addiction could be severe. When abused, hydrocodone could be taken orally (in pill form), chewed, or crushed and snorted. Hydrocodone caused euphoria and a high that persons with a dependency and no actual medical necessity would seek.

16. Tramadol was a narcotic-like pain reliever used to treat moderate to severe pain. It is a Schedule IV controlled substance.

17. Diazepam was a benzodiazepine and affects chemicals in the brain that may become unbalanced and cause anxiety. Diazepam is used to treat anxiety disorders, alcohol withdrawal symptoms, or muscle spasms. Diazepam was sometimes used with other medications to treat seizures. It is a Schedule IV controlled substance.

## PURPOSES OF THE SCHEME

The purposes of the scheme included, but were not limited to, the following:

18. To trade narcotic and other addictive controlled substance medication in return for sexual favors and money.

## NATURE AND EXTENT OF THE SCHEME

19. Beginning in March 2006, the State of Ohio Pharmacy Board implemented a database called the "Ohio Automated Reporting RX System" ("OARRS"). The OARRS database tracked all controlled substance prescriptions filled in the State of Ohio from March 1, 2006, forward. According to OARRS, from November 2012 through October 2014, INGRAM wrote approximately 46 prescriptions for oxycodone products, totaling approximately 1,087 tablets, for approximately 11 different patients.

20. During this same period, INGRAM wrote approximately six prescriptions for morphine products, totaling approximately 672 tablets, for one patient.

21. INGRAM wrote these controlled substance prescriptions to individuals he met at the dance clubs and friends of these individuals in exchange for money and/or sexual favors.

22. Beginning at least as early as November 2012 and continuing to October 2014 INGRAM frequented a series of "strip clubs" in the Akron, Ohio area where he met female dancers.

23. During the course of the scheme, INGRAM issued prescriptions for controlled substances to "patients" without their physical presence at a medical facility and with the "patients" receiving little if any examination.

24. During the course of the scheme, INGRAM issued prescriptions for controlled substances to "patients" knowing, or remaining willfully blind to the fact, that the use of these substances would maintain or create certain dependence and addiction. In so doing, INGRAM often deliberately ignored common and obvious indicators ("red flags") of addiction or dependency and often deliberately avoided learning whether his "patients" were drug-dependent or addicted by, among other things, failing to conduct drug tests and failing to conduct inquiries typically made in the usual course of professional medical practice. During the course of the scheme, INGRAM rarely, if ever, took an adequate medical history or utilized objective diagnostic tests to determine the medical condition that he was purportedly treating. INGRAM likewise rarely, if ever, counseled his patients regarding alternative treatments, such as physical therapy or surgery, advised patients of the addictive nature and risks of the controlled substances he was prescribing, or directed patients to seek addiction counseling.

25. During the course of the scheme, INGRAM issued prescriptions for controlled substances to "patients" without their physical presence at a medical facility and without their receiving any examination. In some instances, INGRAM failed to even meet the person for whom he was writing the controlled substance prescription.

26. During the course of the scheme, INGRAM issued prescriptions for controlled substances to "patients" knowing, or remaining willfully blind to the fact, that the use of these substances would maintain or create certain dependence or addiction. In so doing, INGRAM often deliberately ignored common and obvious indicators ("red flags") of addiction or dependency and often deliberately avoided learning whether his "patients" were drug-dependent or addicted by, among other things, failing to conduct drug tests and failing to conduct inquiries typically made in the usual course of professional medical practice. In addition, INGRAM wrote

controlled substance prescriptions to "patients" whom he knew or believed to be addicted to pain medications. INGRAM did not, in prescribing the foregoing controlled substances, determine whether the person had a legitimate medical need for them.

## COUNTS 1-45

The Grand Jury further charges:

27. Paragraphs 1 through 27 of the indictment are realleged and incorporated into Count 1 of this indictment.

28. From at least as early as November 1, 2012, through on or about October 11, 2014, in the Northern District of Ohio, Eastern Division, the defendant, GREGORY INGRAM, engaged in a scheme whereby he did repeatedly, unlawfully, intentionally, and knowingly dispense and distribute, and cause to be dispensed and distributed, a Schedule II narcotic controlled substance, to wit: INGRAM prescribed mixtures and substances containing a detectable amount of oxycodone to various individuals, for a total of approximately 975 tablets, outside the usual course of professional medical practice and not for a legitimate medical purpose, to the following persons and in the following quantities:

| Count | Date | Person | Controlled Substance | Drug Name/ Strength | Quantity |
|---|---|---|---|---|---|
| 1 | 8-17-2013 | A.Ba. | Oxycodone | 5mg/325mg | 20 tablets |
| 2 | 9-27-2013 | A.Ba. | Oxycodone | 5mg/325mg | 30 tablets |
| 3 | 12-3-2013 | A.Ba. | Oxycodone | 5mg/325mg | 90 tablets |
| 4 | 11-6-2012 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 5 | 11-18-2012 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 6 | 12-17-2012 | A.Bo. | Oxycodone | 5mg/325/mg | 20 tablets |
| 7 | 1-31-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 8 | 3-2-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 9 | 3-25-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 10 | 4-5-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |

| 11 | 4-22-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
|---|---|---|---|---|---|
| 12 | 5-5-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 13 | 5-14-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 14 | 5-24-2013 | A.Bo. | Oxycodone | 10mg/325mg | 20 tablets |
| 15 | 6-14-2013 | A.Bo. | Oxycodone | 5mg/325mg | 15 tablets |
| 16 | 6-20-2013 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 17 | 6-28-2013 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 18 | 7-26-2013 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 19 | 8-5-2013 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 20 | 5-21-2014 | A.Bo. | Oxycodone | 5mg/325mg | 10 tablets |
| 21 | 7-22-2014 | A.Bo. | Oxycodone | 5mg/325mg | 20 tablets |
| 22 | 5-26-2013 | N.G. | Oxycodone | 20mg/325mg | 20 tablets |
| 23 | 6-7-2013 | N.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 24 | 12-6-2012 | M.G. | Oxycodone | 10mg/325 mg | 20 tablets |
| 25 | 12-27-2012 | M.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 26 | 2-10-2013 | M.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 27 | 3-8-2013 | M.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 28 | 5-19-2013 | M.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 29 | 5-31-2013 | M.G. | Oxycodone | 10mg/325mg | 20 tablets |
| 30 | 5-26-2013 | K.P. | Oxycodone | 10mg/325mg | 20 tablets |
| 31 | 12-31-2013 | D.W. | Oxycodone | 5mg/325mg | 20 tablets |
| 32 | 1-8-2014 | D.W. | Oxycodone | 5mg/325mg | 20 tablets |
| 33 | 7-8-2014 | D.W. | Oxycodone | 5mg/325mg | 30 tablets |
| 34 | 8-24-2014 | D.W. | Oxycodone | 5mg/325mg | 20 tablets |
| 35 | 9-10-2014 | D.W. | Oxycodone | 5mg/325mg | 30 tablets |
| 36 | 10-11-2014 | D.W. | Oxycodone | 5mg/325mg | 90 tablets |
| 37 | 6-2-2013 | B.Y. | Oxycodone | 10mg/325mg | 20 tablets |
| 38 | 6-2-2-13 | S.Y. | Oxycodone | 10mg/325mg | 20 tablets |
| 39 | 5-20-2013 | C.F. | Oxycodone | 10mg/325mg | 20 tablets |
| 40 | 6-4-2013 | R.C. | Oxycodone | 10mg/325g | 20 tablets |
| 41 | 5-23-2013 | W.W. | Oxycodone | 10mg/325mg | 20 tablets |
| 42 | 11-11-2013 | D.W. | Roxicet | 5mg/325mg | 12 tablets |
| 43 | 11-18-2013 | D.W. | Roxicet | 5mg/325mg | 20 tablets |
| 44 | 12-3-2013 | D.W. | Roxicet | 5mg/325mg | 30 tablets |
| 45 | 12-9-2013 | D.W. | Roxicet | 5mg/325mg | 20 tablets |

In violation of Title 21, Sections 841(a)(1) and (b)(1)(C), United States Code.

## COUNT 46

The Grand Jury further charges:

29. Paragraphs 1 through 27 of the indictment are realleged and incorporated into Count 3 of this indictment.

30. From at least as early as November 1, 2012, through on or about October 11, 2014, in the Northern District of Ohio, Eastern Division, the defendant, GREGORY INGRAM, engaged in a scheme whereby he did repeatedly, unlawfully, intentionally, and knowingly dispense and distribute, and cause to be dispensed and distributed, a Schedule III narcotic controlled substance, to wit: INGRAM prescribed mixtures and substances containing a detectable amount of hydrocodone to one individual, for a total of approximately 30 tablets, outside the usual course of professional medical practice and not for a legitimate medical purpose, to the following persons and in the following quantities:

| Count | Date | Person | Controlled Substance | Drug Name/ Strength | Quantity |
|---|---|---|---|---|---|
| 46 | 5-15-2013 | G.H. | Hydrocodone | 5mg/500mg | 30 tablets |

In violation of Title 21, Sections 841(a)(1) and (b)(1)(C), United States Code.

## COUNT 47

The Grand Jury further charges:

31. Paragraphs 1 through 27 of the indictment are realleged and incorporated into Count 3 of this indictment.

32. From at least as early as November 1, 2012, through on or about October 11, 2014, in the Northern District of Ohio, Eastern Division, the defendant, GREGORY INGRAM,

engaged in a scheme whereby he did repeatedly, unlawfully, intentionally, and knowingly dispense and distribute, and cause to be dispensed and distributed, a Schedule IV narcotic controlled substance, to wit: INGRAM prescribed mixtures and substances containing a detectable amount of Tramadol to one individual, for a total of approximately 20 tablets, outside the usual course of professional medical practice and not for a legitimate medical purpose, to the following persons and in the following quantities:

| Count | Date | Person | Controlled Substance | Drug Name/ Strength | Quantity |
|---|---|---|---|---|---|
| 47 | 6-30-2014 | D.W. | Tramadol | 50mg | 20 tablets |

In violation of Title 21, Sections 841(a)(1) and (b)(1)(C), United States Code.

## COUNT 48

The Grand Jury further charges:

33. Paragraphs 1 through 27 of the indictment are realleged and incorporated into Count 3 of this indictment.

34. From at least as early as November 1, 2012, through on or about October 11, 2014, in the Northern District of Ohio, Eastern Division, the defendant, GREGORY INGRAM, engaged in a scheme whereby he did repeatedly, unlawfully, intentionally, and knowingly dispense and distribute, and cause to be dispensed and distributed, a Schedule IV narcotic controlled substance, to wit: INGRAM prescribed mixtures and substances containing a detectable amount of Diazepam to one individual, for a total of approximately 30 tablets, outside the usual course of professional medical practice and not for a legitimate medical purpose, to the following persons and in the following quantities:

| Count | Date | Person | Controlled Substance | Drug Name/ Strength | Quantity |
|---|---|---|---|---|---|
| 48 | 5-15-2013 | G.H. | Diazepam | 10mg | 30 tablets |

In violation of Title 21, Sections 841(a)(1) and (b)(1)(C), United States Code.

A TRUE BILL.

Original document - Signatures on file with the Clerk of Courts, pursuant to the E-Government Act of 2002.